## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## ATHENS DIVISION

| | | |
|---|---|---|
| **ROBERT A. JOHNS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **3:01-CV-14** |
| | ) | |
| **REXAM MEDICAL PACKAGING,** | ) | |
| **assignee of BAXTER HEALTHCARE** | ) | |
| **CORP.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### *ORDER ON MOTION FOR JUDGMENT AS A MATTER OF LAW*

Following a trial in this case, on November 1-5, 2004, a jury found for Plaintiff Robert

A. Johns ("Plaintiff") and awarded damages in the amount of $500,000. At the close of

evidence in the trial, Defendant Rexam Medical Packaging ("Defendant") made a motion for

judgment as a matter of law, which was denied. Since the conclusion of the trial, Defendant

has renewed its motion for judgment as a matter of law. Upon due consideration of the

arguments of counsel, the record of the trial, and the relevant legal authorities, the Court finds

that the evidence presented at trial was insufficient to support the jury's verdict and that no

reasonable jury could have returned a verdict for Plaintiff. The motion for judgment as a

matter of law is therefore **GRANTED**.

Rule 50 of the Federal Rules of Civil Procedure authorizes a district court to grant

judgment as a matter of law when "a party has been fully heard on an issue and there is no

legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."

At the close of evidence in the trial of this case, Defendant moved for judgment as a matter of law.  The motion was denied.  After the jury returned a verdict for Plaintiff, Defendant made a timely renewal of the motion for judgment as a matter of law.  On review of a renewed motion for judgment as a matter of law, the district court must consider all of the evidence in the record and draw all reasonable inferences in favor of the nonmoving party.  Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1192-93 (11th Cir. 2004).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  Id. at 1193 (quoting Reeves v. Sanderson Plumbing Products, 530 U.S. 133, 148-151 (2000)).  "'[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.'"  Id.  The Court's prior denial of summary judgment does not foreclose the possibility of judgment as a matter of law after trial.  Abel v. Dubberly, 210 F.2d 1334, 1337 (11th Cir. 2000).

In this case, it is apparent that the jury's verdict was based upon an erroneous application of the legal standard, particularly as to the scope of the "implied covenant of good faith and fair dealing" under Illinois law.  At the close of evidence, the relevant facts were substantially undisputed.  The testimony of Plaintiff, along with the documentary evidence, presented a thorough picture of the course of dealings between Plaintiff and Defendant from the beginning of their contractual relationship in 1990 until its termination in 1999.  The evidence offered by Defendants did not contradict any testimony offered by Plaintiff, though it did provide further detail with regard to certain matters outside Plaintiff's personal knowledge.  The picture that the record presents is the picture of a business venture that

failed.  Failure alone, however, is not sufficient to show a lack of good faith under the Illinois law.  The efforts described by Plaintiff in his testimony and in his correspondence, though ultimately unsuccessful, and unsatisfactory to Plaintiff, were sufficient to meet the requirements of the implied covenant of good faith and fair dealing.

Though the facts in the case were generally undisputed, the legal principles involved were subtle and difficult to grasp.  At the pre-trial conference and during the trial proceedings, the Court and the parties expressed some frustration at drawing an appropriate jury charge. In the end, the Court adopted the following language as a concise statement of the principles set forth in Illinois case law:

> The Court has determined, and both parties concede that neither has violated the express terms of the agreement.  Plaintiff contends in this case that the Defendant has violated an implied covenant.  Under Illinois law, a covenant of good faith and fair dealing is implied in every contract.  The covenant of good faith and fair dealing is not an express term of the contract. However, the law implies such a covenant to be a part of every contract that gives one party broad discretion in performance – that is – when the contractual obligation of one party is contingent upon a condition peculiarly within the power of that party to perform.
>
> The contract between these parties grants such discretion to the Defendant, in that the Defendant's obligations to make payments to the Plaintiff are contingent upon the net sales of the products and the number of patents applied for and/or obtained, while the Defendant has no express obligation to apply for any such patents or make any sales.  Because the contract confers such discretion upon the Defendant, the law imposes on the Defendant a duty to exercise its discretion reasonably, with proper motive, and in a manner consistent with the reasonable expectations of the parties.
>
> To establish a breach of this implied covenant of good faith and fair dealing, Plaintiff must prove by a preponderance of the evidence that Defendant exercised its discretion arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.

It is for you to determine what the expectations of the parties were at the time the contract was signed, whether those expectations were reasonable, and whether Plaintiff has proved by a preponderance of the evidence that Defendant's efforts were not consistent with those expectations and were not reasonable under the circumstances.

A reasonable exercise of discretion does not necessarily require a party to exert its best efforts, particularly where exerting its best efforts would require a party to ignore its business judgment. A party may in good faith exercise no efforts at all, if it can show that its decision to exert no effort was reasonable under the circumstances.

Court's Instructions to the Jury, Doc. 93, pp. 8-11. The jury instruction is derived from

Beraha v. Baxter Healthcare Corp., 956 F.2d 1436 (7th Cir. 1992), the primary case upon

which Judge Lawson relied in the Summary Judgment Order.

Concerns about the charge and a jury's ability to deal with the legal standards involved

proved to have been justified. During the course of its deliberations, the jury returned with

the following questions:

Will the judge review the court instructions to the jury with emphasis on the "covenant of good faith and fair dealing" and the "burden of proof"? Also, please address the instructions regarding each juror making their own decision even if that decision is in the minority.

Can you give us more clarification on "reasonable expectation?"

These questions indicate that the jury was struggling with the terms of the implied covenant.

After lengthy argument from the parties and consideration of amendments and additions to

the charge, the Court decided not to add to or revise the charge originally given. The jury was

instructed to review the charge as given.

The language taken from the Illinois case law to form the charge is inherently

confusing and even somewhat contradictory. According to the Illinois cases, a party violates

4

the implied covenant of good faith if it exercises contractual discretion "arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." Beraha, 956 F.2d at 1443 (quoting Dayan v. McDonald's Corp., 466 N.E.2d 958, 971-72 (1984)). The use of the terms "arbitrary" and "capricious" suggests a very high standard of culpability similar to the standard for punitive damages, while the use of the term "reasonable" in the context of "reasonable expectations" suggests a lower standard of culpability, similar to simple negligence. Despite this apparent contradiction in the language, the Illinois cases by their facts consistently establish that the degree of culpability required is high, as suggested by the terms "arbitrary" and "capricious." This higher standard reflects an understanding that the reasonable expectations of parties to a contract must take into account the uncertainties inherent in any business venture, as well as the fact that the interests of the parties will not always coincide. The jury's questions and its subsequent verdict reveal a confusion about the standard.

When the covenant of good faith is applied properly, a verdict for the defense is the only reasonable outcome. A review of the trial record reveals a complete lack of evidence that Defendant exercised its discretion arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties at the time of the contract. Plaintiff's own testimony shows that Defendant exerted substantial efforts to develop and market the mushroom bag products over the course of many years. Although these efforts did not ultimately succeed, and even if they might have been less than the best efforts, they were consistent with the reasonable expectations of the parties and sufficient to show good faith and fair dealing.

As Judge Lawson explained at length in his Summary Judgment Order, the implied covenant of good faith is not an independent source of duties for the parties to a contract, but rather a guide to the construction of explicit terms in an agreement. See Beraha, 956 F.2d at 1443. Its purpose is to ensure "that parties do not try to take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or to do anything that will destroy the other party's right to receive the benefit of the contract." Voyles v. Sandia Mortgage Corp., 751 N.E.2d 1126, 1131 (Ill. 2001)(quoting Cramer v. Ins. Exchange Agency, 675 N.E.2d 897, 903 (Ill. 1996). The implied covenant requires only that a party vested with discretion as to its performance of a contract exercise its discretion in a manner consistent with the reasonable expectations of the parties. Beraha, 956 F.2d at 1445. It "does not create 'an enforceable legal duty to be nice or to behave decently in a general way.'" Id. (quoting Zick v. Verson Allsteel Press Co., 623 F. Supp. 927, 929 (N.D.Ill. 1985)).

There is no evidence in the record of the trial of this case upon which a reasonable jury could find that Defendant tried to take advantage of Plaintiff in a way that was not contemplated at the time the contract was drafted, or that Defendant acted arbitrarily or capriciously in its performance of the contract. Defendant's efforts were substantial and reasonable given the expectations of the project and the positions of the parties at the outset of the venture. The Agreement in this case was executed on June 20, 1991. The Agreement gave Defendant discretion as to the scope of its efforts to manufacture and market the mushroom bag products proposed by Plaintiff. There was no term in the contract requiring Defendant to produce or sell any bags, or to seek or obtain any patents. Defendant was required only to compensate Plaintiff for any bags sold or patents obtained. The implied

covenant of good faith required, however, that Defendant exercise its discretion in good faith and without acting in such a way as would destroy or injure Plaintiff's right to receive the fruits of the contract.  In other words, Defendant had an implied obligation to make a good faith effort to develop and market the product.  This obligation was not unlimited, however. Defendant was entitled to exercise its own business judgment in determining the extent of its efforts, provided its efforts were within the range of the reasonable expectations of the parties. See Beraha, 956 F.2d at 1445.

In evaluating the reasonable expectations of the parties at the time the contract was executed, it is important to note how little Plaintiff brought to the transaction.  In contrast to the plaintiff in Beraha, Plaintiff in this case approached Defendant not with a fully-developed product ready for market, but with a mere concept for a product.  The concept itself was not original and there were already products on the market using that concept.  Plaintiff testified that he developed his concept in his mushroom cultivation business by experimenting with plastic oven bags purchased from the grocery store, using PVC pipe and materials such as cotton to form a filtered vent.  V. I, pp. 131-32.[1]  The oven bags were able to withstand the heat of the sterilization, or "autoclaving," process.  Later Plaintiff tried without success to attach a filter to the bags.  V.I, p. 140.  An employee's father, who worked for DuPont, suggested that Plaintiff consider using DuPont's Tyvek product as a filter, and referred Plaintiff to Defendant, then known as Baxter Healthcare Corporation.  V.I, p. 141.  Baxter's Rick Bonovitz contacted Plaintiff and expressed interest in developing a product for use in

---

[1]    Citations to the transcript of the trial are identified by volume number and page number.  Citations to exhibits are by exhibit number.  Where both Plaintiff and Defendant tendered the same exhibit, both exhibit numbers are given.

the mushroom industry.  As examples of his concept, Plaintiff sent Mr. Bonovitz a Reynolds oven bag with a filter disk and a Japanese-made "Sun" bag that Plaintiff had discovered through a mushroom supply catalogue.  V.I, p. 144.  The Sun bag already used the concept proposed by Plaintiff of a heat-tolerant plastic bag with a filtered vent.  There is no indication that Plaintiff had any proprietary interest in the filtered-bag concept that would have prevented Defendant from developing the concept on its own.  However, Plaintiff represented himself as an expert in the mushroom cultivation business, and offered his services as a consultant to provide field testing of the products and to advise with regard to marketing in the mushroom industry.  In the contract, Defendant agreed to pay Plaintiff royalties on the bags in exchange for Plaintiff's services as a consultant on the project and for an exclusive right to use Plaintiff's "marketing information, technology, trade secrets, formulations, processes, know how, and other information relating to the Mushroom Industry."  P-9/D-11.

Plaintiff's testimony and record of correspondence with Defendant reveal an extensive history of efforts by Defendant to produce a marketable product.  At the outset of the project, both parties expressed great confidence in the potential of the concept.  In the first months there was much activity.  The Agreement shows on its face that Defendant believed it had already developed a "a flexible plastic sterile ventable container ("Bag") that can be used in the Mushroom Industry."  P-9/D-1.  To develop the mushroom bag, Defendant wedded together two products that it was already producing.  Defendant's primary business was the production of plastic bags for use in the medical field.  One of its products was a bag of polyethylene plastic with a Tyvek vent.  Because polyethylene is not heat-resistant, the vented bags were designed to be sterilized with ethylene oxide gas.  V.III., p. 140.  Defendant also

8

manufactured an unvented polypropylene bag.  The polypropylene material was heat resistant and suitable for steam sterilization at the high temperatures required in the autoclaving process.  Id.  Defendant added the Tyvek vent to the polypropylene bag to produce the steam-sterilizable mushroom bag proposed by Defendant.  Prior to the mushroom bag project, Defendant had never attempted to use a Tyvek vent on a polypropylene bag.  V.III, p. 143.

Within days of the signing of the Agreement, on June 26, 1991, Plaintiff met with Rick Bonovitz and Dick Brown in Atlanta to discuss initial sales efforts and future testing requirements for the bags.  P-16/D-13.  At the Atlanta meeting, Mr. Bonovitz and Plaintiff decided to target mushroom growers in the state of Pennsylvania for their first marketing efforts.  Two days after that meeting, on June 28, 1991, Plaintiff began conducting tests on an initial run of 50 "Opti-Spawn" bags.  P. 21/D-2.  Mr. Bonovitz began his marketing efforts at the same time.  A July 8, 1991 memorandum reflects initial market research conducted by Rick Bonovitz regarding the Pennsylvania growers and their practices and suppliers.  P-18/D-15.

Mr. Bonovitz's July 8 memo foreshadows some of the difficulties that would arise in the project.  In that memo, Mr. Bonovitz notes that one major grower was already using the Japanese "Sun" bag and bags from two domestic sources that used a polypropylene bag with a Tyvek filter.  P-18/D-15.  Another manufacturer was found to be using the Sun bag and working with a domestic manufacturer to produce a rival bag to drive down the price.  Mr. Bonovitz notes:

> I am a little disappointed, but not surprised, that we're not going one on one with the Japanese Sun Bag or the jar concept.  **The bag concept is well established and there are more players than we anticipated**.  Everyone

seems to have their own idea what works best, and it appears we are talking about a custom market.

On the optimistic, positive side, everyone seems interested in seeing what we have, so the market has not settled on "a bag."  The volume discerned to date is not anywhere near what we anticipated, but there are some good opportunities.

P-18/D-15.  For all his expertise in the industry, it appears that Plaintiff failed to give Defendant an accurate depiction of the then-existing market for mushroom cultivation bags. There was already more competition in the marketplace than either party anticipated.

As the initial marketing efforts continued, Plaintiff and Mr. Bonovitz traveled to Pennsylvania to visit area spawn producers on July 17 and 18, 1991.  Plaintiff described the visit as "an interesting and productive trip."  P-23/D-2.  Mr. Bonovitz followed up on the visits by sending sample "Opti-Spawn" bags to the producers he visited.  In October 1991, Plaintiff and Mr. Bonovitz attended a national sales meeting at Defendant's headquarters in Deerfield, Illinois, where the agenda included training in the marketing of the Opti-Spawn products.  P-27.  Mr. Bonovitz had four sales people reporting to him.  V.III, p. 207.  The record of correspondence shows that Mr. Bonovitz and his sales personnel corresponded with and visited growers throughout the United States and in Europe.  Samples were sent to many growers, who showed some interest in the product.

In the midst of these early marketing efforts, evidence began to emerge of a flaw in the concept of the Opti-Spawn bag.  Upon his return from the Deerfield sales meeting in October of 1991, Plaintiff received a telephone call from Charles Losito of grower Alpha Spawn, who reported concerns about the Tyvek vent falling off the bags.  P-29/D-2.  There is no indication that Plaintiff's initial tests of the product had revealed such a problem.  V.II,

p. 206.   In November 1991, Plaintiff felt that the Tyvek vent was working and was enthusiastic about the future of the product.  V.I, p. 213.  The first evidence that Plaintiff acknowledged a problem with the vent adhesion comes in an October 22, 1992 letter to Rick Bonovitz, in which he discusses his concern about the Tyvek "peeling" during the shaking process.  P-50/D-38.  The letter indicates that Plaintiff had already begun experimenting with an alternative filter material produced by Horizon Micro-Environments.  He suggests that Horizon engineers had developed a method for bonding the material to polypropylene by adding a laminate, and that Horizon was manufacturing a sample roll of the material for use by Defendant.

As the failure of the initial Tyvek/polypropylene concept became apparent towards the end of 1992, the mushroom bag project entered into a lengthy pattern of trial and error in an attempt to develop a new concept for a marketable bag.  Defendant's engineers eventually determined that they could not achieve a consistent seal between Tyvek and polypropylene. V.III, p. 151.  Plaintiff has testified that at some time prior to December 29, 1992, Defendant notified him that they would require an estimated three years of additional research and development to develop a new concept for the steam-sterilized bag.  V.I, p. 233; P-52.  In the meantime, Mr. Bonovitz intended to continue to pursue sales of the "sterile fill" bag (V.II, p. 217), which was essentially Defendant's original vented polyethylene medical bag, unsuitable for steam sterilization.  V.III, p. 143.  Although this product was part of Defendant's product line before Plaintiff introduced it to the mushroom industry, Defendant paid royalties to Plaintiff for sales of the bags.  Sales of the sterile fill bags never approached the massive

11

volume anticipated by Plaintiff.  The record shows that the highest level of sales was achieved in 1994, when Defendant sold just under $110,000 worth of the bags.

The process of developing a new concept for the steam-sterilizable bag was time consuming.  Defendant would create a prototype and send samples to Plaintiff, who would test them in mushroom cultivation.  The grow-out process would take months, and Plaintiff insisted that three sets of tests were necessary for scientific validity.  V.I, p. 245; P-65.  After his field testing, Plaintiff would submit his observations about the deficiencies of the bags. To address these deficiencies, Defendant's engineers tested different polypropylene resins and different filter materials and adjusted the design of the bag.  This process also took time.

It is evident from the record that each adjustment to meet one complaint would cause a new complaint as to another requirement.  As engineer Kit Divieski testified,

> Sometimes, when you changed the product to meet one requirement, you end up goofing one you already had.  So it made it very difficult, because new requirements kept coming up each time.

V.III, p. 164.  For example, in a September 30, 1993 meeting, Plaintiff, Mr. Bonovitz, and engineer Kit Divieski discussed problems with organic particles from the growth medium sticking to the Horizon filter material, problems with excess porosity in the Horizon filter, and problems with stress whitening of the plastic after heating.  V.II, pp. 91-92; P-60/D-42.  In March 1994, Plaintiff agreed to begin testing a new version of the bag with the Horizon vent. P-65.  On July 20, 1994, Plaintiff reported his observations of the new bag.  P-74/D-48.  In that report he observed that the filter adhesion was improved, but encouraged a more thorough seal.  He found the clarity of the new plastic to be "totally unacceptable," noted that the plastic had a tendency to stick to itself, and expressed concern about the "flimsy nature of the new

plastic."  He also urged Defendant to include a gusset in the next design, as used in the Sun

bag.

      Once again, Defendant worked to address Plaintiff's concerns and apply his

suggestions.  The addition of a gusset was particularly difficult for Defendant's engineers.

As Ms. Divieski testified:

> As soon as you put a gusset in the bag, you really complicate the bag-making
> process even more.  You have to take the film and put this arm in that will
> cause a fold in the bag, and then you have to seal through more layers.  So the
> gusset is a nice thing to have.  It makes a bag more useable.  But from a bag-
> making process, it's a lot more difficult.

V.III, p. 153.  The addition of the gusset caused new problems with pinpoint leaks in the

corners of the bag, which were unacceptable in the mushroom industry.  Id.  In addition,

Defendant did not use gussets on its medical products, so that production of the gusseted bag

required the installation of new equipment on Defendant's production machines.  Id.

      On November 9, 1994, Plaintiff reported on the results of his tests on the next version

of the bag.  D-50.  He continued to express dissatisfaction with the clarity of the bag, the

"self-sticking phenomena of the plastic," and its failure to hold shape during inoculation.  He

found that the Horizon filter was "still too porous for industrial application."  He approved

of the gusset, however.  On February 28, 1995, after another series of field tests, Plaintiff felt

that the project was "on the cusp of success."  D-52.  He continued to express dissatisfaction

with clarity and with self-adhesion.  The record shows that in the summer and fall of 1995,

Mr. Bonovitz began once again to pursue marketing of the steam-sterilizable bag.  In the fall

of 1995, Mr. Bonovitz attended the 14th Congress on the Science and Cultivation of Edible

Fungi in Oxford, England.  V.III, p. 236; P-95.  He sent follow-up letters to the producers he

contacted there, as evidenced by his notes (P-95) and by examples at P-97/D-58, P-98/D-59, and P-99/D-60.  Meanwhile, attempts to address the self-adhesion and clarity issues led to a re-emergence of the poor bond between the vent and the bag.  In a June 17, 1996 report Plaintiff explained that his tests "resulted in total failure of the filter-to-bag adhesion."  D-65.  An October 21, 1996 letter reported continuing problems with the adhesion of the vent.  P-108/D-66.

Finally, in a December 3, 1996 letter, Plaintiff reported a successful run of tests on the bag.  P-110/D-68.  After two rounds of further testing, on April 4, 1997, Plaintiff concluded:

> Because of the excellent results obtained especially from parts 1 and 2 of this very long experimental process, and because of the acceptable performance of part 3 of the experiment it is of my opinion that the Opti-Spawn bag is on its way to becoming the WORLD'S GREATEST SPAWN BAG.  I maintain my position that additional tests should be considered before irreparable mistakes are made with the key players in the marketplace, but it is legally in REXAM's hands . . . I truly hope that the correct decision is being made here for all parties concerned.

P-115 (emphasis, ellipsis in original).  On May 14, 1998, Plaintiff reported his observations "on the final validation testing of the Opti-Spawn II bag."  P-128.  His conclusion remained enthusiastic, and he concluded, "All decision makers at The Growing Company are convinced and ready to go!!!"  Id.  Once again, the record shows that Mr. Bonovitz reinitiated marketing efforts, attending the Penn State Specialty Mushroom Workshop in June of 1998 and sending letters and samples to producers.

At the same time that it appeared the project would finally succeed, Plaintiff retained an attorney and began to demand renegotiation of the contract.  Plaintiff's attorney, Russell Quarterman, sent a letter to Mr. Bonovitz in March of 1998, alleging that Defendant had

"utterly failed" to comply with the Agreement and threatening to terminate the contract.  V.III, pp. 41-43; P-122.  Mr. Quarterman did not remember Plaintiff relating to him that Plaintiff was in the midst of a final validation test on a workable product at the time.  V.III, p. 43.  The purpose of the March letter was "to get [Defendant's] attention."  V.III, p. 47.  In April of 1998, Plaintiff and his attorney met with Rick Bonovitz and offered to renegotiate the contract.  V.III, pp. 46-48.  In a letter to Defendant's legal counsel dated August 14, 1998, Mr. Quarterman states:

> [Plaintiff] has instructed me to either notify you of breach and termination as set forth in the contract or in the alternative to begin meaningful discussions concerning the renegotiation of the contract to compensate my client for the loss of revenue he has already suffered because of your past and current failures.

P-139/D-90.  This letter received no response.  Mr. Quarterman sent a second letter dated September 28, 1998, demanding a response and threatening legal action.  P-141.

In January, 1999, Mr. Bonovitz challenged Mr. Quarterman's assertions regarding attempts to market the bags and denied any unpaid obligations.  P-147/D-97.  He proposed to extend the contract by two years.  In a letter dated July 8, 1999, Plaintiff wrote personally to Mr. Bonovitz to express his frustration with the delay in the development of the bag.  P-159/D-104.  In his letter he notes continued problems with the bags, some of which did not seal adequately.  He also states that Defendant had failed to ship him an order of 20,000 bags for his own company's use.  After recounting his history with the project, he describes his recollection that Defendant had "painted a picture of making me an instant millionaire if I gave up rights of art, etc. of my idea," and complains that "I have not become an instant millionaire, nor have I a reliable product of which my company can depend on for

production."  In response to Plaintiff's demands for renegotiation, Defendant offered to continue with the original agreement and give Plaintiff a one-year consulting contract for $25,000.  P-164.  This offer was not accepted and there is no evidence of a counter-offer.  On April 10, 2000, Plaintiff, through counsel, notified Defendant of his intent to terminate the contract.  Since the termination of the contract, Defendant has discontinued any attempts to create a product for the mushroom cultivation industry.

Defendant's record of performance under the agreement is not in dispute.  Based on this record, no reasonable jury with an adequate understanding of the implied covenant of good faith and fair dealing could have found that Defendant's performance was arbitrary, capricious, or in a manner inconsistent with the reasonable expectations of the parties.  There was no evidence to show that Defendant tried to take advantage of Plaintiff in a way that could not have been contemplated at the time of the contract.  To the contrary, all the evidence shows that Defendant undertook substantial efforts in pursuit of the project.  Defendant may indeed have gone beyond the reasonable expectations of Plaintiff.

The reasonable expectations must be evaluated in light of what the parties brought to the project at the outset.  Plaintiff brought to Defendant the simple idea of attaching a Tyvek filter to a plastic bag for use in mushroom cultivation.  He had no finished product design or expertise in manufacturing or engineering.  Defendant offered its manufacturing facilities, engineering expertise, and marketing staff.  Plaintiff offered his knowledge of the requirements of mushroom growers and his growing facilities for field testing.  Defendant already manufactured a polyethylene bag with a Tyvek filter and an unfiltered polypropylene bag.  The concept was to attach the Tyvek filter to the more heat-tolerant polypropylene and

16

create a bag suitable for use in the mushroom industry.  As Plaintiff testified, he knew nothing about plastics.  ("I didn't know polyethylene from Polly Brown."  V.I, p. 142).  At the time, neither he nor Defendant foresaw the difficulty of creating a bond between the Tyvek and polypropylene that would withstand the high temperatures of steam sterilization.

In the first years of the project, Defendant acted as would be expected.  It produced prototype models of the product which were submitted to Plaintiff for field testing.  It appointed Rick Bonovitz to oversee marketing.  Mr. Bonovitz began immediately to make contacts within the mushroom industry, to attend conferences, and to visit production facilities.  He met with Plaintiff to learn more about mushroom cultivation.  A meeting was held at Defendant's headquarters to train sales staff about the industry and the bag concept.  As Plaintiff testified, Mr. Bonovitz was an effective marketer (V.II, p. 218), and his early efforts generated some interest in the product.  The early marketing efforts were hindered, however, when customers began to complain about the Tyvek filter coming loose from the bag.

As problems with the adhesion of the Tyvek filter first became apparent, Defendant made efforts to improve the seal.  By the end of 1992, it was clear that such efforts were futile and that the Tyvek/polypropylene concept was unworkable.  At that time, in good faith, Defendant could have acknowledged failure and walked away from the project in good faith.  The implied covenant of good faith does not write into every contract a guarantee of success.  Plaintiff's apparent expectation to become an "instant millionaire" was not reasonable, particularly when he brought nothing more than a bare idea to Defendant.  The Agreement contemplated that either party might seek to end the relationship.  Defendant was authorized

to terminate the Agreement at any time that it was not selling a bag.  Plaintiff was authorized to terminate for any noncompliance by Defendant upon six months notice.

Neither party chose to terminate after the initial failure.  Instead, they chose to go forward and explore new materials.  Upon the failure of the Tyvek concept, the project changed from a simple modification of existing products, as originally anticipated, into a research and development project.  As a result of personal contacts with representatives of Horizon Micro-Environments, Plaintiff suggested the substitution of a Horizon-made filter for the Tyvek filter.  For the next several years, Defendant worked with Plaintiff in a time-consuming cycle of testing and re-engineering.  The record shows that Defendant attempted to address each new concern brought forward by Plaintiff after each round of testing, and there is no evidence that Defendant ever refused to implement any of Plaintiff's suggested improvements.  The fact that the development process took longer than Plaintiff might have hoped is not evidence of a failure to perform in good faith.

As the Seventh Circuit panel noted in <u>Beraha</u>, the implied covenant of good faith does not require a party to a contract to exert the maximum possible effort.  Indeed, a party can in good faith exert no effort at all, if it can show that a business decision to exert no effort was reasonable under the circumstances.  956 F.2d at 1445.  Plaintiff and Plaintiff's counsel implied several times during the trial that because Defendant was a large international corporation, it could have and should have devoted more resources to the project.[2]  He offered

---

[2]    At one point, Plaintiff – attempting to justify his own failure to be aware of the level of existing competition in the mushroom bag business prior to the Agreement – even suggests that it was "absurd" for such a large corporation to rely on his professed expertise concerning the mushroom industry.  V.II, p. 186.

no evidence or argument as to the level of commitment of resources that would have been required to show good faith.  Given the speculative nature of the project at the outset, and the undeveloped nature of the concept that Plaintiff brought to Defendant, it was not reasonable for Plaintiff to expect Defendant to build a new factory or to engineer new machinery or to devote substantial sums of money to research and development activities.  Defendant's performance over the nine-year history of the project was well beyond the requirements of good faith and fair dealing.

Plaintiff contended at trial that Defendant's bad faith was shown by Defendant's affiliation with a French company, SPS, that produced an unspecified quantity of bags for use by a mushroom grower.  The evidence related to the activities of SPS was minimal, however. A party opposing judgment as a matter of law must show more than a "mere scintilla" of evidence to avoid judgment as a matter of law; "there must be a substantial conflict in evidence to support a jury question."  Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1237 (11th Cir. 2001)(quoting Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir.1989).  The evidence regarding SPS is insufficient to create a substantial conflict in the evidence.  The trial record shows three pieces of evidence related to the activities of SPS.  First, Defendant's president and general counsel, Frank Brown, testified that he learned during the discovery for this case that SPS had "sold a few bags to a mushroom maker."  V.III, p. 86.  Second, Rick Bonovitz testified that he learned in 1994 or 1995 that SPS produced a sterile fill bag for a customer in France.  Finally, documentary evidence of notes from the 1995 International Congress meeting in Oxford, England shows that Mr. Bonovitz made the remark, "need follow up from SPS," next to the name of a French grower called Le Champion.  Such is the

extent of evidence presented with regard to the activities of SPS.  It is insufficient to create an inference that Defendant suppressed the project with Mr. Johns in order to give an advantage to SPS.  Despite being given an extension of discovery to pursue evidence related to SPS, Plaintiff produced no evidence that SPS ever had more than a minor presence in the mushroom bag business, that SPS ever attempted to sell mushroom bags outside of France, or that SPS ever colluded or communicated with Defendant regarding its mushroom bag business.  In addition, the evidence showed that SPS and Defendant were not even affiliated prior to late 1993, a year after the original Tyvek concept had failed.  V.III, p. 233-34.  Before SPS ever entered the picture, Defendant had already gone beyond the requirements of good faith in its dealings with Plaintiff.  It cannot be argued that the existence of the SPS product gave Defendant an incentive to allow the Tyvek concept to fail, and the evidence related to SPS is too weak to support a conclusion that Defendant had an incentive to suppress the product afterwards.

Plaintiff also presented insufficient evidence to show a lack of good faith in Defendant's failure to obtain patents on any of its products.  Plaintiff never produced a single piece of evidence to show that Plaintiff or Defendant, together or separately, ever developed a patentable product.  He offered no expert witness to testify about the suitability of the mushroom bag concept for a patent.  Defendant, by contrast, presented uncontested evidence that the concepts that Plaintiff brought to Defendant in 1990 and 1991 were already patented by others and in production.  Plaintiff originally approached Defendant with a heat-tolerant plastic bag (a Reynolds brand oven bag) wrapped around a PVC pipe with a piece of cotton or other material inside as a filter.  This concept was patented in the United States in 1958.

D-117.  A bag design very similar to the concept proposed by Plaintiff was patented by two Japanese inventors in 1982.  D-120.  The 1982 patent involved a polypropylene bag with a filter made from "Celgard," a product of the Celanese Corporation.  A bag using Tyvek filters was patented in 1990 by two Canadian inventors.  D-122.  There is evidence that two American companies were marketing a bag with a Tyvek filter at the time Plaintiff and Defendant entered into the Agreement.  The Sun bag was already well-established by then.  Because Plaintiff's bag concept was so unoriginal, there could have been no reasonable expectation for Defendant to obtain a patent.

Plaintiff further argues in response to the current motion that Defendant's lack of good faith was shown by its failure to seek a patent on a "tumbling table" product developed by Plaintiff.  This argument is in contradiction to Defendant's own testimony.  Defendant testified that he did not invent the tumbling table and that it was not "Johns technology" as defined in the contract.  Plaintiff could not remember who invented the machine, but stated that it was the property of his business, The Growing Company.  V.II, pp. 141-43.  In fact, Plaintiff expressly represented to Defendant that the tumbling machine was not Johns technology and was the exclusive property of The Growing Company.  P-121/D-77.  Instead of asking Defendant to patent the product pursuant to the Agreement, Plaintiff offered "to discuss a distribution licensing of this machine through Rexam Medical Packaging."  In other words, Plaintiff expressly sought to exclude the machine from the coverage of the Agreement so that he or his company could have exclusive rights to it, in spite of the Agreement's provision that grants Defendant "a worldwide exclusive license to the Johns Technology."

P-9/D-11, ¶ 2.  Whatever the potential of the tumbling table product,[3] Plaintiff's conduct made it clear that Defendant had no good faith obligation to Plaintiff to seek a patent for this device.

Based on the record of performance by Defendant, no reasonable jury could have found that Defendant failed to comply with the implied covenant of good faith and fair dealing under its Agreement with Plaintiff.  All the evidence in the record shows to the contrary that Defendant acted in a manner consistent with – and even exceeding – the reasonable expectations of the parties at the time the Agreement was executed.  That the project ultimately failed is not evidence of a lack of good faith.  All reasonable parties to a business venture must contemplate the possibility of failure.  That Defendant did not expend all of its resources or the maximum possible effort in the project is alone no evidence of a lack of good faith.  The implied covenant of good faith is a minimal requirement and does not demand extraordinary efforts.  Defendant's commitment of resources was more than reasonable under the circumstances.  There was no evidence that the failure of the project worked to Defendant's advantage at Plaintiff's expense.  Both parties invested several years of effort in the project to no effect.  Based on the substantial and undisputed evidence to show that Defendant's performance was in good faith and consistent with the reasonable expectations of the parties, the Court can only conclude that the jury misunderstood or wrongly applied the legal standard under Illinois law.

Because there was no legally sufficient evidentiary basis for a reasonable jury to find for Plaintiff under the controlling law, Defendant's motion for judgment as a matter of law is hereby **GRANTED**.  The Clerk of Court is directed to enter final judgment in Defendant's

---

[3]     Plaintiff presented no evidence that the tumbling table was patentable.

favor.  Defendant's motion for new trial is also conditionally granted pursuant to Rule 50(c)(1) of the Federal Rules of Civil Procedure, on the grounds that the verdict of the jury was against the great weight of the evidence and was a miscarriage of justice, for the same reasons set forth above.

**SO ORDERED** this 1st day of June, 2005.

**s/ C. ASHLEY ROYAL**
C. ASHLEY ROYAL
UNITED STATES DISTRICT JUDGE

CW/jec